**CLEVELAND INSTITUTE OF ELECTRONICS, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 1:91CV0325.

United States District Court, N.D. Ohio, E.D.

March 12, 1992.

Richard Katcher, Christopher J. Swift, Baker & Hostetler, Cleveland, Ohio, for plaintiff.

Stephen T. Lyons, Dept. of Justice, Tax Div., Washington, D.C., Annette G. Butler, Office of U.S. Atty., Cleveland, Ohio, for defendant.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

Plaintiff Cleveland Institute of Electronics ("CIE") brings this action for a refund of taxes, interest, and penalties that were assessed against, and collected from, CIE by the United States. The government claims that CIE's sales persons are employees from whom CIE must withhold federal income taxes. CIE counters that its sales persons are independent contractors, and that therefore CIE need not withhold any federal income tax from its sales persons' compensation. At stake is approximately $474,000 in employment taxes, penalties, and interest, which the Internal Revenue Service ("IRS") has assessed against CIE for the years 1986, 1987, and 1988.[1]

CIE has paid to the IRS the taxes, penalties, and interest assessed against it with respect to one of its sales persons. Now, CIE seeks to recover those amounts from the IRS through this suit for a refund. There is no genuine issue of material fact, and both parties have moved for summary judgment on the issue of whether CIE sales persons are independent contractors as defined by statute. Because the Court finds that CIE is entitled to judgment as a matter of law, CIE's motion for summary judgment is granted, and the IRS's motion for partial summary judgment is denied.

### I.

The relevant material facts are not in dispute. In 1986, 1987, and 1988, CIE sold home study educational courses to students worldwide. These educational courses instruct students in several disciplines within the field of electronics, such as industrial electronics or broadcast engineering. When a student buys a CIE course, he receives course-specific lesson books and equipment by mail. Students study at home at their own pace, completing lessons in the lesson book and experimenting with or repairing the equipment. Students take open-book examinations and send them by mail to CIE, where the examinations are

---

1. CIE has not contested whether the IRS properly computed the amount of taxes, interest, and penalties owed under 26 U.S.C. § 3509.

normally graded the same day and returned by mail. Students must achieve a minimum of 70% to pass an examination. Students may also take a closed-book, practical examination, which is supervised by an individual of the student's own choosing.

CIE mandates that certain courses must be successfully completed by a student as a prerequisite to that student's taking further courses. At the end of a chosen curriculum, a successful student receives from CIE a diploma and letters of recommendation. While pursuing their studies, students are eligible for Pell grants, guaranteed student loans, and veterans' benefits.

CIE advertises and sells its educational courses through direct mail. In addition, CIE sells its courses through the use of commissioned sales persons. CIE's sales persons are compensated solely on the basis of their sales performance. The sales persons solicit sales of the CIE educational courses by meeting with prospective students in homes, in shopping malls, at military posts, and at other locations that are not permanent retail establishments. The functions of CIE sales persons include only selling—they do not serve as educational instructors for CIE.

As previously mentioned, CIE's sales persons sign a contract with CIE which states that the sales persons will be paid solely on a commission basis. The contract also states that the sales person is an independent contractor and that he will not be treated as an employee for federal tax purposes. Accordingly, CIE did not withhold any federal taxes from its compensation payments to its sales persons during the years in question. The sales persons reported to the IRS that their compensation from CIE was income from self-employment, and they paid appropriate amounts of self-employment tax.

Nonetheless, the IRS took the position that the CIE sales persons were not independent contractors, but were instead CIE employees. As such, the IRS assessed Federal Insurance Contributions Act ("FICA") taxes, Federal Unemployment Tax Act ("FUTA") taxes, federal withholding taxes, and non-payment penalties against CIE. The total assessment exceeded $474,000. This suit is to determine whether the assessment of those taxes was appropriate.

## II.

For many years, the question of whether a taxpayer was an independent contractor or an employee was a question to be answered exclusively by the common law. Borrowing principles from agency law, courts would weigh up to twenty factors in determining whether a worker was an independent contractor or an employee. *See, e.g., Associated Bicycle Service, Inc. v. United States*, 128 B.R. 436, 451–57 (Bankr.N.D.Ind.1990) (citing factors outlined in other cases and in the Restatement (Second) of Agency). Because the common law approach used so many factors to determine employment tax status, however, employers often found themselves guessing about whether they had to pay employment taxes.

In response to the "problems arising from increased employment tax status controversies," Congress enacted 26 U.S.C. § 3508. Staff of Joint Comm. on Taxation, 97th Cong., 2d Sess., General Explanation of the Revenue Provisions of the Tax Equity and Fiscal Responsibility Act of 1982, p. 382 (Comm. Print 1982) [hereinafter, "Joint Committee Report"]. The purpose of 26 U.S.C. § 3508 was to create a shelter for taxpayers who met certain criteria. By meeting the statutory requirements, an individual was automatically given the status of an independent contractor, and was therefore not an employee for employment tax purposes:

> The Act establishes two categories of statutory nonemployees: (1) qualified real estate agents and (2) direct sellers. If certain conditions are satisfied, sales persons who are licensed real estate agents and individuals who are direct sellers will be treated, for Federal income and employment tax purposes, as self-employed persons.

*Id.*

The new statute did not supplant the common law; rather, it merely guaranteed

independent contractor status for those taxpayers who met its conditions. If a taxpayer did not meet the criteria set forth in the statute, he could still qualify as an independent contractor under the established common law tests. But Congress created a shelter exclusively for "certain direct sellers and real estate sales persons" because it "believed that it was these workers who were most in need of an immediate solution to the problem of proper employment tax status." *Id.*

In the instant case, the government takes the position that CIE sales persons do not meet the test for independent contractor status under either 26 U.S.C. § 3508 or the common law. However, the motions for summary judgment before this Court are limited to the issue whether CIE sales persons are protected by the shelter of 26 U.S.C. § 3508. As acknowledged earlier by both parties, summary judgment for CIE on this issue would end the case—if CIE sales persons are independent contractors under the statute, CIE would be entitled to a refund. Summary judgment for the government, on the other hand, would lead to extended discovery to determine whether CIE sales persons pass the common law test for independent contractor status. Therefore, both parties agreed to submit motions for summary judgment on the sole issue of whether CIE employees are independent contractors under 26 U.S.C. § 3508. Through its holding that summary judgment should be granted to CIE, the Court enters a final appealable order and finds that further discovery is unnecessary.

### III.

■ 26 U.S.C. § 3508 begins with the general rule that "in the case of services performed as a ... direct seller—(1) the individual performing such services shall not be treated as an employee, and (2) the person for whom such services are performed shall not be treated as an employer" for employment tax purposes. The statute then sets forth three conditions that must be satisfied in order for a taxpayer to qualify as a direct seller:

The term "direct seller" means any person if—

(A) such person—

 i) is engaged in the trade or business of selling (or soliciting the sale of) consumer products to any buyer on a buy-sell basis, a deposit-commission basis, or any similar basis which the Secretary prescribes by regulations, for resale (by the buyer or any other person) in the home or otherwise than in a permanent retail establishment, or

 (ii) is engaged in the trade or business of selling (or soliciting the sale of) consumer products in the home or otherwise than in a permanent retail establishment,

(B) substantially all the remuneration (whether or not paid in cash) for the performance of the [direct selling] services ... is directly related to sales or other output (including the performance of services) rather than to the number of hours worked, and

(C) the services performed by the person are performed pursuant to a written contract between such person and the person for whom services are performed and such contract provides that the person will not be treated as an employee with respect to such services for Federal tax purposes.

26 U.S.C. § 3508(b)(2).

CIE argues that its sales persons qualify as "direct sellers" because they meet all three of the conditions set forth under 26 U.S.C. § 3508. CIE asserts that: 1) CIE sales persons sell consumer products directly to buyers in locations that are not permanent retail establishments; 2) CIE sales persons are compensated on a commission basis only; and 3) the agreements between CIE and its sales persons explicitly state that, for federal tax purposes, the sales person is an independent contractor and not a CIE employee.

The government concedes that CIE sales persons meet the second of the three conditions listed in the statute, since CIE sales persons are compensated based exclusively upon their sales performance and not upon hours worked. The government also ad-

mits that CIE sales persons meet the third condition of the statute, since CIE and its sales persons have entered into written agreements that clearly outline the sales persons' tax employment status. However, the government argues that CIE sales persons do not meet the first condition set forth in the statute.

The first condition listed in the statute states that to qualify as a "direct seller," a person must sell "consumer products in the home or otherwise than in a permanent retail establishment." 26 U.S.C. § 3508(b)(2)(A)(i). The government acknowledges that CIE sales persons sell the CIE educational courses in "home[s] or otherwise than in permanent retail establishment[s]." However, the government contends that the educational courses which the sales persons are selling are not "consumer products." Because CIE sales persons sell something other than "consumer products," the government argues, the sales persons do not meet the first condition of the statute and therefore cannot claim its shelter. Thus, the sole issue raised by the cross-motions for summary judgment is whether the educational courses sold by CIE sales persons are "consumer products" within the context of 26 U.S.C. § 3508.

## IV.

The government argues that the educational courses sold by CIE are not consumer products, because CIE is really selling a course of education and not merely books and equipment. The government asserts that by selling a course of education, CIE sales persons are selling an intangible service and not tangible goods, and that only tangible goods can be consumer products.

CIE responds by arguing that Congress did not mean to limit the term "consumer products" to encompass only tangible goods, and that the CIE educational courses are properly deemed "consumer products" as contemplated by Congress. CIE also argues that its sales persons are indeed selling tangible goods—books and equipment—so that even under the govern-

ment's definition of consumer products, CIE sales persons may find shelter under the statute.

The term "consumer products" is not defined in 26 U.S.C. § 3508 itself. However, there are three other sources that can inform the Court on the meaning of this term: 1) the statute's legislative history; 2) uses of the same term as found in other federal statutes; and 3) federal regulations construing the statute. These sources are examined separately below.

### A. Legislative History

The legislative history behind 26 U.S.C. § 3508 begins with a House Bill, H.R. 4961, 97th Cong., 1st Sess. § 271 (1981) [hereinafter "House Bill 4961"]. House Bill 4961 proposed enactment of a statute that would provide a safe harbor for sales persons that met certain requirements. If the following five criteria were met, a sales person would be treated as an independent contractor for tax purposes and his employer would not have to pay employment taxes: 1) the sales person, not the employer, controlled the hours the sales person worked; 2) the sales person provided or paid for his own office space; 3) the sales person's income was based on his own sales output, not on hours worked; or, the sales person had invested substantially in assets necessary to work for the employer; 4) the sales person and employer entered into a written contract stating that the sales person was an independent contractor for federal tax purposes and that he was responsible for paying self-employment taxes; and 5) the employer filed the necessary tax returns. Absent from House Bill 4961 is any use of the terms "direct sellers" or "consumer products."

House Bill 4961 was passed and sent to the Senate, which produced its own Bill. S.Rep. No. 494 (Vol. 1), 97th Cong., 2d Sess. 91, 358–70 (1982), *reprinted in* 1982 U.S.Code Cong. & Admin.News 781, 861, 1091–1102 [hereinafter "Senate Bill 494"]. While Senate Bill 494 modified many provisions of the proposed legislation, it did not modify § 271 of House Bill 4961. Senate Bill 494 did, however, provide a lengthy

discussion of the then-present common law applicable to employment tax status and an explanatory section titled "Reasons for Change." Senate Bill 494 at 363. The primary reasons cited for the proposed change in the law were that

a statutory 'safe-harbor' test for determining ... whether an individual should be classified as an employee or an independent contractor will reduce the number of tax status controversies ..., and will provide greater certainty and simplification in this area of the tax law. In addition, ... the formal requirements of the safe-harbor will improve tax compliance on the part of independent contractors qualifying under its provisions.

*Id.* Senate Bill 494 stressed this last reason, adding that other provisions in the Bill would also "greatly improve tax compliance among independent contractors." *Id.* Again, however, Senate Bill 494 makes no mention of the terms "direct sellers" or "consumer products."

The "consumer products" phrase appeared in the Bill that came out of conference between the two houses of Congress. H.R.Conf.Rep. No. 760, 97th Cong., 2d Sess. 467, 650–51 (1982), *reprinted in* 1982 U.S.Code Cong. & Admin.News 1190, 1420–21 [hereinafter "Conference Report 760"]. Conference Report 760 explained that the safe-harbor test proposed in House Bill 4961 and Senate Bill 494 had been abandoned in conference. Instead of a broad safe-harbor test, the new proposal was given a much narrower focus. The legislation that came out of conference merely created "two categories of statutory nonemployees." Conference Report 760 at 651. Under the conference version, only qualifying real estate agents and direct sellers were afforded independent contractor status. Conference Report 760 contains no discussion of the "Reasons for Change" from the common law, or any reasons for change from the proposals contained in the House and Senate Bills. Nor does the Conference Report make any mention of exactly what is meant by the term "consumer

products."[2] The Congressional Record is similarly unrevealing of what Congress meant by the phrase "consumer products" in the context of 26 U.S.C. § 3508.

In sum, the legislative history behind 26 U.S.C. § 3508 provides no clue as to exactly what Congress meant when it used the term "consumer products," and certainly gives no indication whether CIE's educational courses qualify as consumer products. At best, the legislative history demonstrates that the purposes behind the statute are to reduce the number of controversies regarding employment tax status and to improve tax compliance on the part of independent contractors. Before relying on the statutory purpose alone to decide this case, other sources of meaning for the phrase "consumer products" must be examined.

### B. "Consumer Products" In Other Legislation

There exist four other statutes passed by Congress that employ the term "consumer products." They include the Consumer Product Safety Act, the Magnuson–Moss Warranty Act, the Federal Anti–Tampering Act, and the Energy Policy and Conservation Act. The definitions of the term "consumer products" employed by these Acts are as follows:

#### 1. The Consumer Product Safety Act

The Consumer Product Safety Act defines a "consumer product" as

any article, or component part thereof, produced or distributed (i) for sale to a consumer for use in or around a permanent or temporary household or residence, a school, in recreation, or otherwise, or (ii) for the personal use, consumption or enjoyment of a consumer in or around a permanent or temporary household or residence, a school, in recreation, or otherwise....

15 U.S.C. § 2052(a)(1).

#### 2. The Magnuson–Moss Warranty Act

The Magnuson–Moss Warranty Act defines a consumer product as

---

**2.** The Senate Conference Report did not discuss the meaning of consumer products, either. *See*

Senate Conf.Rep. No. 530, 97th Cong., 2d Sess. (1982).

any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes....

15 U.S.C. § 2301(1).

3. The Federal Anti–Tampering Act

The Federal Anti–Tampering Act defines a consumer product as

(A) any "food," "drug," "device," or "cosmetic," as those terms are respectively defined in ... the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 321); or

(B) any article, product or commodity which is customarily produced or distributed for consumption by individuals or use by individuals for purposes of personal care or in the performance of services ordinarily rendered within the household, and which is designed to be consumed or expended in the course of such consumption or use.

18 U.S.C. § 1365(g)(1).

4. The Energy Policy and Conservation Act

Finally, the Energy Policy and Conservation Act defines a consumer product as

any article (other than an automobile ...) of a type—

(A) which in operation consumes, or is designed to consume, energy; and

(B) which, to any significant extent, is distributed in commerce for personal use or consumption by individuals;

without regard to whether such article of such type is in fact distributed in commerce for personal use or consumption by an individual.

42 U.S.C. § 6291(a)(1).

The government correctly notes that under the Federal Anti–Tampering Act and the Energy Policy and Conservation Act, CIE's educational courses would not quali-

fy as consumer products. The government also insists that all of these Acts have in common the limitation that "consumer products" means only tangible goods, like toothpaste or books, and not services or other intangibles, like haircuts,. insurance policies, or CIE's educational courses.

The government, of course, is right—under any of these other statutes, CIE's educational courses probably would not qualify as consumer products.[3] However, the Court is not interpreting these other statutes, and indeed, they are inapposite. These statutes address, respectively, ensuring the safety of consumer products, ensuring the adequacy of warranties on consumer products, preventing criminal tampering with consumer products, and improving the energy efficiency of consumer products. These statutes have nothing to do with tax employment status or direct selling activity.

Moreover, the fact that each statute has a different definition for the same term argues *against* using any one of these definitions in the context of 26 U.S.C. § 3508. It is clear that Congress has treated the meaning of the phrase "consumer products" as malleable, changing its significance to meet the purpose of the statute in which the term is employed. In fact, Congress has defined "consumer products" differently every time it has used the term—except once. The exception is 26 U.S.C. § 3508, when Congress failed to provide any definition at all. Thus, searching for the meaning of "consumer products" as used in 26 U.S.C. § 3508 by examining other federal legislation is fruitless. Congress's past use of this term does not provide the Court with any meaningful guidance.[4]

### C. Federal Regulations

The IRS has published proposed regulations construing 26 U.S.C. § 3508. These

---

**3.** On the other hand, the books and especially the equipment that CIE sends to its students may well have to meet the standards set forth in these statutes regarding safety, energy efficiency, and adequacy of warranties.

**4.** Moreover, Congress appears disinclined to provide the guidance that the Court seeks. Not only has Congress failed to specifically autho-

rize any regulations construing the statute, but observers noted nine years ago that "[e]ither additional legislation in [this] area will be forthcoming soon or Congress is signaling its intent to dodge the issue entirely." Sally M. Jones and Robert L. Black, *TEFRA clarifies independent contractor status but area still remains unsettled,* 58 J.Tax'n. 148 (Mar.1983).

regulations provide the following definition for the term "consumer product:"

> The term "consumer product" means any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes (including any such property intended to be attached to or installed in any real property without regard to whether it is so attached or installed). The term "consumer product" does not include any product used in the manufacture of another product to be distributed in commerce or any product used only incidentally in providing [sic] a service (e.g. insecticide used in a pest control service, materials used in an appliance repair business).

Treatment of Qualified Real Estate Agents and Direct Sellers as Nonemployees, 51 Fed.Reg. 619, 624 (proposed Jan. 7, 1986) (proposed as 26 C.F.R. § 31.3508–1(g)(3)).

These regulations, if accepted by the Court as controlling, would settle the issue at hand. The CIE "educational courses" sold by CIE's sales persons include books and equipment, which of course are tangible goods. However, these tangible goods are only sold incidentally to the provision of a service—the education of CIE customers.[5] Under the regulations, therefore, CIE's sales persons are not selling consumer products.

Because the regulations are merely proposed and not adopted, however, they must be construed as having been published for the limited purpose of giving the public notice that the regulations are under consideration. Id. at 622; 10 Bender's Federal Tax Service § P:10.41[3] (1991). In fact, at public hearings on these proposed regulations, testimony was heard criticizing the suggested definition of consumer products. Sam Goodley, IRS Hears Testimony on Qualified Real Estate Agents and Direct Sellers Regulations, 31 Tax Notes 1164 (June 23, 1986) (Neil H. Offen, testifying on behalf of the Direct Selling Association, stated that the distinction drawn in the proposed regulations between sellers of tangible goods and intangible services was "without support in the statute or relevant legislative history.").

Furthermore, there are other factors that give the Court reason not to adopt the definition of "consumer products" as set forth in the proposed regulations. The proposed regulations were published in 1986. Six years later, they have still not been adopted in final form. This delay might indicate that the IRS itself has not determined whether the proposed regulations should be ratified. See Garvey, Inc. v. United States, 1 Cl.Ct. 108, 118–19 (1983), aff'd, 726 F.2d 1569 (Fed.Cir.1984), cert. denied, 469 U.S. 823, 105 S.Ct. 99, 83 L.Ed.2d 44 (1984) (passage of five years from publication of proposed regulations without final adoption could logically give rise to inference that IRS had reason to doubt wisdom of proposals). In addition, the proposed regulations were not issued until nearly four years after 26 U.S.C. § 3508 was enacted. Regulations not promulgated contemporaneously with or shortly after enactment of a statute should be given less deference, since the congressional intent is no longer presumed to have been known. Rowan Cos. v. United States, 452 U.S. 247, 253, 101 S.Ct. 2288, 2292, 68 L.Ed.2d 814 (1981) (quoting National Muffler Dealers Assn. v. United States, 440 U.S. 472, 477, 99 S.Ct. 1304, 1307, 59 L.Ed.2d 519 (1979)); see generally Michael I. Saltzman, IRS Practice and Procedure 3.02[4][b] (2d ed. 1991) (discussing interpretive regulations).

Thus, the Court is not persuaded by the proposed federal regulations that CIE's educational courses fail to qualify as "consumer products." The proposed regulations define the term "consumer products" by drawing a distinction between tangible and intangible products. Introductory re-

---

5. CIE argues that the books and equipment are not "incidental" to the educational courses because the books and equipment are not "nonessential." However, CIE misconstrues the meaning of "incidental" in this context; in these regulations, incidental means "secondary", not "non-essential." Pesticide is not "nonessential" to pest control services. Rather, pesticide is "secondary" to the primary service of pest control, and books and equipment are "secondary" to the gaining of an education.

marks to the proposed regulations rely on this distinction to state that a door-to-door sales person selling vacuum cleaners may be considered a direct seller of consumer products, but that a door-to-door sales person selling cable television subscriptions may not. The Court does not find support for this distinction in the statute itself, nor in the statute's legislative history, nor in language used in other federal statutes. The meaning of the term "consumer products," as Congress used this term in 26 U.S.C. § 3508, must come from another source.

## V.

■ Faced with a decision concerning the meaning of a disputed term in a statute, and without other convincing guidelines, a Court must rely on two things: the plain meaning of the term and the underlying purpose of the statute. *See, e.g., Moskal v. United States*, ─── U.S. ───, 111 S.Ct. 461, 468, 112 L.Ed.2d 449 (1990) (finding the meaning of a statute "both in the plain meaning of [the statute's] words and in the legislative purpose underlying them"). Unfortunately, there seems not to be a plain meaning of the term "consumer products." The Court is aware of the terms "consumer goods" and "consumer services;" does the term "consumer products" contemplate both of these? If Congress meant to limit the meaning of "consumer products" to denote only tangible consumer goods and not consumer services, as the proposed regulations suggest, then why did Congress not use the term "consumer goods?" As shown by Congress's use of the term "consumer products" in different pieces of legislation, this phrase does not have an exact, plain meaning.

This leaves, as a guide for the Court, the underlying purpose of the statute. As stated in Senate Bill 494, the purposes originally behind the statute were to reduce the number of controversies regarding employment tax status and to improve tax compli-

ance on the part of independent contractors. It is clear that the purposes behind the statute are best advanced if the term "consumer products" is construed to include both tangible consumer products and intangible consumer services.

The number of controversies regarding employment tax status will be decreased by allowing direct sellers of goods *and* services, who meet the other statutory requirements, to be considered independent contractors. To find that this statute applies only to direct sellers of tangible goods will inevitably lead to disputes over whether a direct seller is selling goods or services. This suit is a prime example. The regulations attempt to address this issue with examples of goods sold "incidentally" to the provision of services, but disputes over the meaning of "incidental" are also sure to appear. And what to make of a sales person who sells both household cleaning products and subscriptions to a long distance telephone carrier? [6] The task of resolving these disputes is avoided if "consumer products" is given a different meaning than the one proposed in the regulations. If the statute is instead construed to confer independent contractor status on *all* direct sellers who meet the statute's other criteria, regardless of what it is the direct sellers are selling, then fewer employment tax status controversies will result.

The other purpose behind the statute is to improve the tax compliance of independent contractors. Giving effect to this statutory purpose has no correlation with whether "direct sellers of consumer products" is construed to mean "direct sellers of tangible consumer goods only" or "direct sellers of tangible consumer goods or intangible consumer services." Either way, the direct sellers have to meet the other criteria in the statute before they are considered independent contractors. And it is these *other* criteria that go to the issue of tax compliance—that is, the sales persons must enter into an agreement with the employer which explicitly states that the

---

**6.** Individuals selling for Amway Corporation, for example, sell both Amway household products as well as subscriptions to MCI Telecommunications Corporation's long distance telephone service.

sales person is an independent contractor and not an employee for federal tax purposes. Indeed, in this case, even though the IRS insists that CIE sales persons were not selling consumer products, the IRS does not contest CIE's assertion that its sales persons paid all appropriate self-employment taxes.

Accordingly, the Court holds that the underlying purposes of 26 U.S.C. § 3508 are best served by interpreting the term "consumer products," as used in that statute, to include both tangible consumer goods and intangible consumer services. The Court does not make a finding as to whether CIE's sales persons are selling tangible goods incidental to providing a service, or are selling consumer goods alone, or are selling consumer services alone, since such a finding is unnecessary. Under the Court's reading of 26 U.S.C. § 3508, CIE's sales persons are selling "consumer products." Hence, CIE's sales persons are statutory nonemployees. Therefore, CIE's motion for summary judgment is granted, and judgment is entered accordingly.

IT IS SO ORDERED.